First and only case this afternoon, U.S. v. Fumo. Mr. Zausmer. Thank you very much, Your Honor. Good afternoon. Robert Zausmer on behalf of the government. And I'd like to reserve five minutes for rebuttal. Sir. Thank you very much. Your Honor, as the Court well knows, we are here because the government asserts that there were a number of errors committed by the District Court in sentencing the defendants, Mr. Fumo and Ms. Arnao. The Court determined to impose low sentences on the defendants, and we believe that it committed a number of procedural errors, and that if these procedural errors are corrected, they will point to much longer appropriate sentences. In our view, the Court did not comport with a number of very, very clear precedents of this Court. Now, as the Court's aware, we've asserted a number of errors. There are, I suppose, involving loss calculations, two other enhancements. I want to jump over those. Of course, I'll answer any questions the Court has. But I want to talk about the variance versus departure, because I think that really illustrates the problem that we have here. This Court has been explicit in numerous precedential decisions since Booker in requiring specific procedural rules be followed in order to assure that a sentence is imposed consistent with the statute. But also to assure that this Court is able to engage in effective appellate review. And one of the more important things is for a Court to establish what it does at sentencing to correctly calculate the guideline range and to identify whether there's a departure or a variance from the guideline range. You actually had made quite a number of applications for departures or enhancements. Well, yes. Is that right? Now, were any variances granted in this case? We don't know. The problem, well, first of all, the Government asked for an upward variance, and the Court did not address that at all. That's one of the errors that we have asserted. The Court, contrary to this Court's rule, that any issue of potential legal merit needs to be addressed on the record. The Court did not address at all the Government's request for an upward variance on a number of very compelling grounds with regard to both Mr. Fumo and Ms. Arnao. Well, that was after the Court had, in fact, sentenced Mr. Fumo to 55 months. No, that was before. What happened procedurally, Your Honor, was... Is that after the Court rejected many applications for departures? No. All right, help me out then. Let me help you out. What happened here was the Court first endeavored to calculate the guideline range. There was actually a hearing for both defendants about six days before the sentencing hearing for Mr. Fumo in which the Court simply addressed the guideline calculations. And then it came out with a two-page order right after that saying, here's what the guideline ranges are. We have asserted a number of errors with regard to those guideline calculations which are unexplained and really undefended as well. You're talking about the initial guideline range? Exactly. So the Government and the Probation Office had advocated that Mr. Fumo's guideline range was in the range of 21 to 27 years. The Court, by lopping off a number of applicable guideline enhancements, said that his range was more in the range of 10 years. The moment the Court did that, which was several days before the sentencing hearing, the Government filed a motion for an upward variant saying that the guideline calculation now no longer took account of many significant aggravating factors. That request was filed before the sentencing hearing. It was argued at length at the sentencing hearing and the Court never ruled on it, nor did it address the aggravating factors themselves. Now with respect to the defense, the defense moved for a departure as part of the sentencing papers. It asked for a departure on two grounds. One, medical condition for Mr. Fumo, and second, his quote, extraordinary public service as they characterized it. The District Court explicitly denied the departure for medical condition and that's not before this Court. But then we have utter confusion over what happened with the reduction for extraordinary public service. The District Court said that it did grant a credit to Mr. Fumo for public service, and at the sentencing hearing it repeatedly said it was a departure. The Government repeatedly argued that a departure on the facts presented was impermissible as a matter of law, and that's something I'd like to address today if I have the time. But the Court did say it granted a departure. After the hearing was over, the defense filed a motion on a variety of issues, but one of the things it said was to the District Court, you really should clarify that what you meant was a variance. The Government was a little suspicious of this. We said in our answer that they were trying to get a more favorable appellate posture given that we thought the departure was simply impermissible. The District Court then in response to that said, well yes, I did grant a departure, but it was more akin to a variance. And that's where we get the confusion where we say to this Court, we're not sure what this Court is reviewing and it's a significant reason that this sentence should be vacated. If it had been a departure, somewhere about that point, you would have gotten the final guidelines range. Exactly. Is that fairly accurate? That's correct, Your Honor. You never got a final guideline range. We never did. And what we did get from the District Court, this is page 1653 of the appendix, it's a fundamental mistake with all respect to the District Court. The Court said, and I quote, this is in a post-sentencing ruling that the Government couldn't respond to, quote, the Court never enunciated the guideline level to which it departed. And in fact, never reached the sentence it did by consulting any specific level on the guideline chart. Under the precedent of this Court, I could list ten precedential decisions that that is inconsistent with. This Court has made clear, and the Supreme Court has made clear in Rita, that the Court must find a guideline range and keep it in mind throughout the sentencing proceedings in order to comply with the mandate of Section 3553. It sounds like a very fundamental error. That's our view, Your Honor. If we characterize it that way, that would require resentencing. Is that your position? That is our position, Your Honor. Now the defense in response says, well, it was always a departure. So now we've moved from A to B and back to A, and it's not. It's a very confusing record. We have a judgment and commitment order in which the District Court checked off everything, departure, variance. And so we don't see how that can be reviewed. Now one thing I would like to ask, I want to get what's laying underneath this, is this concept of public service as a basis for either a departure or a variance. And even though we think that vacating the sentence is essential, based on what I've described so far, it would be helpful to have guidance from this Court as these prolonged proceedings perhaps continue as to the propriety of this reduction based on public service. It's our view, and we feel very strongly about this, that under the law of this Court, a downward departure based on the public service that was described to the District Court is impermissible as a matter of law. This Court said in Serafini that a person who has a public position and does the things that are part of that public position cannot receive a departure. Well, if it was a departure, but you can grant a variance on the basis of public work, can you not? You can. And there our view is, and this is where we get to a later part of the appeal, well, yes, we recognize that a variance can be given on almost any ground, but the variance has to, the length or extent of the variance has to be justified by the fact that you're considering. And we think that to say public service justified the extreme variance in this case. Shouldn't we take, shouldn't we take the judge at his word? He did say it was a variance, didn't he? Well, he said both. Well, he did, but he did say, eventually he said the procedure I follow was perhaps more than a downward departure. But then in the judgment and commitment order, Your Honor, it checked off that it granted a departure based on community service and good works. We don't have a clear record here no matter how you look at it. If you are taking the judge at his word, then reversal is nevertheless required. This is where the recent Negroni decision comes in. No, actually, I'm not sure what it was. I, I, there is confusion in the record because just before that he referred to it as a departure. Yes, sir. So maybe the defense could help me out with that. And also said that he didn't consider any particular guideline range, which is a fundamental error just by itself. The, with regard to the variance though, Your Honor, Negroni makes very clear and reasserts what this Court has said before, that if you give a, a large variance, there has to be a substantial justification and there has to be an explanation of how the basis of the variance justifies the final sentence. In this case, that wasn't given. To say that somebody, Mr. Fumo, and, and we, we proved this explicitly at trial and it was really never disputed until the appeal. Mr. Fumo was a part-time legislator. He did a good job as a part-time legislator according to his constituents. He delivered constituent service. He took positions that many people agreed with. That, there's no explanation of how doing a good job as an elected public official on a less than full-time basis can justify an extreme variance for stealing every single day from the public, that you're performing that job as a public official. In our view, the, the explanation that the district court gave not only does not justify the extent of the variance, it's fairly outrageous. Can you tell what the extent of the variance was? Well, not sure. The, now we have our guideline errors that I do have to get back to. According to the district court, the guideline range was 121 to 151 months. That's the problem I have. You got, you have a guideline range which seemed to be the advisory guideline range. I'm not sure about that, but it seemed to be at least a preliminary guideline range. The next thing I know, the sentence was 55 months. I, I don't know what the starting point was for the reduction to 55 months. Can you tell me that? Yes. The guideline range advocated by the pre-sentence report was 262 to 327 months. Now the district, that included a two-level upward departure that the government recommended based on Mr. Fumo's perjury at trial. And the district court denied that. We're not disputing that. That would lower the range to 210 to 262. The district court, however, took out $2 million of loss, clearly applicable enhancements for using a charitable organization for sophisticated means. And by taking out numerous levels, really without giving any guidance, it lowered the guideline range to 151. And for Ms. Arnao, inappropriately lowered the guideline range as well. All right. But the 55-month sentence wasn't, wasn't dropped from that guideline range. According to the district court, the 55 months was dropped from 121 to 151. So even on the district court's time... So it was cut more than half. It's cutting it more than half. But it, but we can't escape the fact that we had... But is it the question whether the judge articulated or rationalized the sentence that he gave? Yes. That's the procedural error that we've asserted. It's exactly the same as in the recent Negroni decision. But we also can't escape the fact that the guideline calculation is wrong. The range here is not 121 to 151. The government, there was really no rebuttal and there still is not on appeal, as we explain in our brief at length, to the, to the loss calculations that the government put forward. There's no explanation for the judge ignoring a $150,000 part of the loss for the Rubin contract just because he said it was too complicated to, to address at the last minute. I can go through those individuals. Okay. Was there, was your problem with that? Judge McCarthy, did you want to ask? Yes. I just wondered, did he ever rule on the Rubin matter? No, Your Honor. He did not. He said that he would not rule on it because the defense had presented new evidence at the last minute. Well, but the evidence was that he, in fact, Mr. Carter did the work for the money that he was paid. Right. Well, just to talk about... Did the district did not rule on the issue or was your, your, your issue with the rationale that the judge gave? Well, the, the issue is that the court didn't rule. We... I couldn't find any ruling on it. The issue is that the district court didn't rule. We can't ask this court to make the factual ruling. The government disputes strongly that Mr. Rubin did work. Let me just point out quickly with regard to Mr. Rubin, this was something the jury found beyond a reasonable doubt that Rubin did no work. The defense presented a defense case and called three meager witnesses on this that didn't defeat the government's view that Rubin did no work. Suddenly... And the reason for the judge's failure to, not to rule on that issue was what? Well, he said it was because it raised complexities and the date of sentencing had arrived and the, and the court wanted to proceed. It was a clear error under Rule 32. And it would change the guideline range for Mr. Fumo by itself. And, and we, and that's just one of a numerous... Could you touch on one thing that I had a concern about, which is the Tasker Street property. In other words, the judge had arrived at certain loss calculations and then at one point said, however, I'm going to give you credit for an increase in the fair market value of this property. Yes. I've, I've not heard of, of that kind of offset. So maybe you can... Well, we have, we haven't either. And, and, and we argue that it's erroneous. The defense asked for it. Now the final number, the actual number of this credit, 600 and something thousand dollars. Interestingly, the parties are in agreement that that number makes no sense. It wasn't announced by the district court until after the sentencing was over, when it issued its exact guideline findings. We asked for it at the sentencing hearing and the district court said it didn't have its papers with it. We couldn't respond to the exact number, which both parties now agree was incorrect. But it's our principal argument, Your Honor, that giving any credit for the market value of this property is an incorrect definition of loss. The, the fraud here is the Citizens Alliance bought this building. They had every right to buy this building and use this building. The fraud was, is they gave substantial rent-free use of the property to Mr. Fumo. They built and gave him a free parking lot to use, which had tremendous value. Took care of all sorts of maintenance. Lavishly furnished the rooms that he used. None of that has anything to do with market value. And that's our main argument. You have there a $600,000 plus error. Even if it had anything to do with market value, can you use market value to offset a loss calculation? No. And our secondary argument is that even if you could, you can't give him credit for all of the market value without then taking into account what Citizens Alliance paid to obtain the property. The pretense here was that this property, which they said was worth $1.2 million, which it really wasn't. But the pretense was that this thing just appeared and Mr. Fumo should get credit for it. And then the court gave him credit in a strange mathematical way. But, but they had a million dollars worth of expenses just in inquiring and improving it, which would also change the guideline calculation by itself. So the problem here is the procedural requirements, is making sure that you have an accurate guideline range, stating what it is, and then fully considering it in deciding the sentence. The additional error, of course, is that the court has to consider any issue of legal merit that's presented by either of the parties. And here the government stressed crucial factors with regard to both Mr. Fumo and Ms. Arnao that were never addressed. His perjury at trial, the effect that this had in destroying Citizens Alliance, the effect that this had on the public reputation of the Senate and the public's view of their elected officials, the disparity in sentence that was created with other sentences in this case and in other cases. I see my time is up. Mr. Sanzari, yes, your time is up. We'll get you back on rebuttal. Thank you very much, sir. Thank you. Mr. Buffone. Yes, good afternoon, Your Honor. May it please the Court. What the government has just presented is an examination of a sentencing that they cast as plagued by a number of procedural errors, one where there was utter confusion, in their words, over one of the principal findings that was made. Your Honors, we significantly disagree with that characterization of what Judge Buckwalder did here. You don't disagree that the judge never arrived at a final guideline range, do you? Yes, Your Honor, I do disagree with that. You disagree with that? What the judge did here was to very carefully – I actually thought post-sentencing you had made a Rule 35 motion to see – to inquire of the judge what the final guideline range was. Yes, Your Honor. We did make a Rule 35 motion. As part of that motion, we sought guidance from the Court on whether it was a departure or a variance. After that, two significant things happened. First, there was the response to our motion where the government's argument was specifically accepted by the Court. It said, I departed, I didn't vary. In the statement of reasons, there was additional clarification that the judge intended to depart. But most importantly, Judge Fuentes, Ms. Arneo was sentenced shortly thereafter. And Judge Buckwalder, in that sentencing, made it clear that Ms. Arneo was getting a variance and not a departure, in contrast to what Mr. Fumo was awarded. At every stage of this, Your Honor, the Court was very careful to clarify that it was, in fact, awarding a variance and not a departure. Well, I'm still a little confused. I have no problem in concluding that Arneo received a final guideline range. But I do have some trouble with regard to Mr. Fumo. I don't know. Maybe you can tell me. You say that there was a final guideline range and that it was 121, 121 months to 151 months? Yes, Your Honor. That was the final guideline range? That was the final guideline range before the departure. Well, but if you have a departure, doesn't that change the final guideline range? Yes, it does, Your Honor. And if we look at the federal sentencing guidelines themselves, the definition of departure, as recognized by this Court, is that a departure is a change in the sentence. In Kuhn v. United States, the Supreme Court taught us that departure is one of the most critical parts of the overall federal sentencing guideline structure. It is the heartland concept. What was that range, though? The range was 121 to 151 months, if I could, Your Honor. I understand that range, but there was a change after that. And the judge referred to it as either a departure or a variance. And the government is saying, tell us what it is. What is that final number? The final number, Your Honor, was 55 months. And if I could point the Court to Appendix page 1. What range was that? Did that come from? I'm sorry, Judge Garza. What range did that come from? It was a reasoned determination by the judge, Your Honor, of considering all of the information that was available to him from the sentencing guidelines. I think the question was, what guideline range does the 55-month sentence come from? Which would be my question also. Yes. The Tories' case, Your Honor, is precedent of this circuit. Could you tell me the range, Mr. Buffon? The departure, Your Honor, was done in months, not in ranges. Judge Buckwalter was very explicit about that. And neither the guidelines nor the case law of this circuit requires that a guideline departure be stated in terms of sentencing levels rather than months. And in fact, the definition of a departure itself is a change from the sentence. And under the guideline structure, a change in the sentence is articulated in terms of months and not levels. It would elevate form over substance, as Judge Buckwalter himself recognized in his statement of reasons, to say that a departure to a specified number of months without delineating the guideline range that the departure was to was not necessary. The judge started with, as he said at appendix page 185, I first determined what the applicable guideline range was. He didn't say it, but that was 121 to 151 months. I next determined whether there should be a departure from the guidelines and announced at the sentencing hearing that there should be, based on my finding, extraordinary good works by the defendant. Unlike other cases before this Court where there has been a lack of clarity, the judge here found, first, what the guideline range was, and second, ruled that I'm departing and gave the specific reason why I was departing. Now, I believe where – But doesn't our case law, Gunter and Negroni, require that the sentencing judge consider all applications for departures and enhancements and then arrive at a final guideline sentencing range? Isn't that what these cases stand for? What I believe the case law stands for, Your Honor, is the well-known three-stage test. Decide what the guideline range is, rule on any motions for departure, and then go to the 3553A factors and determine whether there should be a variance from the ultimate guideline sentence. What Judge Buckwalder did here that may have been a bit unusual but was well within his discretion was to say I did the first stage, I calculated the guideline range. I did the second stage under Gunter. I made a determination that a departure for extraordinary good works was in order. What I then did was rather than announce the level that I was departing from – What was that first step? What was that first range? The first range was 121 to 151 months. You start there and then you have a series of motions and applications for departures or enhancements, et cetera, which are going to change that initial range. Is that accurate? That's correct, Your Honor. After you rule on that, then you have a different guideline range, do you not? Yes, you have an ultimate guideline sentence, Your Honor, once the departure process is completed. Now, it may have been preferable, although I believe it's harmless error if it was error, for Judge Buckwalter to, at that point, to say I'm finished with stage two. But we don't know what he departed from when he imposed that 55-month sentence, which I think is Judge Garth's question. He entertained quite a large number of applications for enhancements, that is to alter that initial guideline range. He got quite a few applications for departures as well, and he made a variety of rulings. But we don't know where we ended up. We don't know what his final guideline range is. That's exactly so, and that's why I'm confused by your argument, particularly since there were a number of enhancements that the government called for, and I can't tell what happened with them. Judge Garth, the way you can tell what happened is twofold. First, to look at the statement of reasons and the opinion that the judge issued after the first day of the sentencing hearing. When he addressed, we had a full day of hearing, and all that was addressed was guideline calculations. At the end of that day of hearing, the judge took it under advisement and issued a ruling on up or down what he was doing on every request for guideline enhancements, guideline calculations, and departure, save one. He said, I'm going to wait until the sentencing hearing to make a determination of whether or not I'm going to grant the charitable works departure. He also reserved with the agreement of the parties on the Mitchell-Rubin item. He then, after sentencing, issued at the point of the sentencing, he announced this at the beginning of the sentencing. As to some of these things, he said, my notes aren't in front of me, so I'll tell you what I decided, but I can't give you the exact calculations. In his statement of reasons, the memorandum that accompanied his statement of reasons form, he answered every one of those questions and specified what his ruling was on every one of the requests for a guideline-specific determination. What about Mitchell-Rubin? Mitchell-Rubin received a $150,000 contract, which the government says was for no work at all. And then the judge said, well, I'm not going to rule on it. But if he had ruled on it, that would have changed the guideline sentencing range. I mean, isn't that clear? And what about the Guzzella painting? And what about the misrepresentation of a charitable organization, which the government asked for an enhancement? And what about the fact that he did not explain his decision with respect to the sophisticated means by which he arrived at this? I don't understand how the 55 months was arrived at. Judge Garth, let me try to address each of those items, but to address them overall. In Rita v. United States, the Supreme Court analyzed the amount of discretion that a district court judge has under reasonableness review. And it held that that discretion is quite broad and that reviewing courts should look to the overall nature of the sentencing and not require district court judges to write extensively about the statement of their reasons, as long as it is apparent from the overall record. So let's take something like two of the items. Mr. Buffone, let me just suggest to you, if you would, that I was a district court judge and I know what the discretion that is to be exercised is, but I do not find that discretion exercised in the enhancements that the government asked for. For instance, it's one thing if he grants them. Then he's supposed to explain it. And if he denies it, he's supposed to explain why he denies it. But I don't find that in this record. Judge Garland, let's take the two enhancements that your honors talked about, sophisticated means and misrepresentation of relationship with charitable organizations. There was a full day's hearing in which there was extensive argument before the judge. Both sides presented their positions on that. There was extended briefing both in the objections to the PSR and the sentencing memorandums filed with the court addressing that issue. The judge ruled and said on the record and in his statement of reasons, I am adopting the defense position and rejecting the argument that either of those enhancements apply. Under RETA, the judge had done a lot more than merely take the party's position and say I agree with one side or the other. You think that's enough? You think the judge can just say I'll take the government's position, I'll accept that, or I'll take the defense position, I'll accept that? It depends on the state of the record, Judge Fuentes. If we didn't have the kind of detailed record that we have here with thousands of pages of materials appearing before the judge, a full day of hearing, clear argument by the parties, questioning by the judge, under RETA we can go back and look at that and discern what the judge did. If we had what is probably the more average sentence that occurs in this courthouse, it is conducted more quickly without as much elaborate consideration. There might be a question. What was the defense position with regard to the sophisticated means? The defense position with regard to the sophisticated means, Your Honor, Was it that it's a judgment call? No, not that it's a judgment call, Your Honor. That it's an intent call. At the time that, for example, eastern leasing was set up, did Mr. Fumo have the intent to use it as a way of concealing his scheme or of executing the scheme by using it as part of it? The record before the court, which is entitled to deferential review, indicated that eastern leasing was set up for a legitimate business purpose, and that legitimate business purpose was to hold from liability the ownership of the vehicle. Eastern leasing had one and only one function, which is to purchase and lease cars from Mr. Fumo. Is that wrong? Did it misrepresent the purpose of eastern leasing? No, Your Honor. Eastern leasing leased vehicles for others. Not all those cars were leased. My reading of the record is that eastern leasing didn't even have any employees. It didn't, Your Honor, and I don't mean to suggest that it did. And I think any other corporation that has subsidiaries doesn't necessarily populate those subsidiaries with either full or part-time employees. They are special purpose vehicles well known in the corporate world. It seemed to me that eastern leasing was nothing but a shell company that was merely set up so it wouldn't have to report its conduct because it was a private company. But, Your Honor, the question is, was it evidence of the use of sophisticated means in the commission of the offense? And was the intent in establishing eastern leasing to use it for that purpose? And I submit that it was not. I would like to answer questions, but I have a minute and a half less, and I have not addressed our direct appeal. Go ahead. So with the consent of the court, I'm happy to answer any additional questions. Yeah, go ahead. Mr. Fumo was denied his right to an impartial jury. The jurors in this trial were subjected to information provided by a third party indicating that Mr. Fumo had been the subject of a prior prosecution for political corruption, that he had been convicted by a jury, and that that conviction had been set aside. A second thing was made known to that juror, and that was that Mr. Carter, who had been closely linked to Mr. Fumo in the course of the trial, had in fact been convicted of defrauding the Independent Seaport Museum, the very entity that he and Mr. Fumo were alleged to have cooperated in in their fraud. That became known to the district court judge after it was reported through an affidavit of defense counsel, reporting on conversations with a respected Philadelphia reporter. You know, the problem, one problem I had with that is you have to develop a foundation or a basis in order to get a hearing to inquire into these things. But what's presented to the judge, unless I'm mistaken, is a statement by an attorney that a reporter said that somebody else said. You think that's reliable enough for a judge to schedule a hearing as to the reports that were made to the juror? Yes, Your Honor, I think it is, but there was more to it than that. By the time that the judge ruled on this, the article had been published in the Philadelphia Inquirer, subjected to independent fact-checking by the inquirer. And this is the way that information is most likely to come to the attention of the court. A juror speaks with another party, indicates that that juror was exposed to an extraneous influence. A juror spoke to a reporter who spoke to an attorney who then allowed that attorney to make an affidavit. You think that's sufficiently reliable? It's sufficiently reliable, Your Honor, to allow for a hearing. At a minimum, that juror should have been brought into the courthouse and questioned about whether or not the acts that were alleged had occurred. And, in fact, Your Honor, one of the things that was done here was that the judge assumed that the facts presented in the affidavit were accurate and then made a finding that if they were presumed to be true, that there would be no potential prejudice arising from that kind of taint of the jury. Evidence that had been specifically excluded at trial was permitted to come before the jury in the form of a third-party contact. This deprived Mr. Fumo of his right to an impartial jury. I see that my time has run out. I'm happy to answer any other questions the panel may have. No further questions, Mr. Buffone. Thank you very much. Mr. Egan. Good afternoon, Your Honors. Patrick Egan on behalf of Ruth Arnao. In light of the Court's many questions, I'd like to start by pointing out why Ruth Arnao is entirely different in this case, and her situation and her sentencing were entirely different than the sentencing of Mr. Fumo. She actually got what I would call a final guideline range, did she not? She absolutely received a final guideline range, and, Your Honor, she did absolutely receive a variance from that final guideline range. And therefore, all that the Court needs to consider in this case is whether or not the judge did the appropriate things in imposing the sentence based upon that variance. And what Judge Buckwalter saw in this case, and think about this, a lot of you are former trial judges. Judge Buckwalter sat through a five-month trial. During that five-month trial, he was able to observe all of the evidence and see the role of Ms. Arnao in this case. He was also able to see the interplay between Ms. Arnao and Mr. Fumo. And the government comes today, and they stand before the Court, and they say, at least in their briefs, they didn't talk about Ms. Arnao much in their argument. But in their brief, they essentially say, they're not before the Court arguing that the sentence was improper. They're here before the Court arguing that the judge did not adequately explain the sentence. And if Your Honors look at the record on behalf of Ms. Arnao, at her sentencing, it was clear that Judge Buckwalter adequately and appropriately addressed all the 3553A factors and gave many different important and useful and completely valid bases for the sentence that he imposed. Do you think the judge gave adequate consideration to the disparity between Arnao's sentence and the sentence that were imposed on the other defendants? Absolutely, Your Honor, both in the case itself and in cases around the country. And I'll tell you why. Because what the guidelines speak about is unwarranted disparity. And what Pepper has most recently instructed us, and what the Supreme Court has repeatedly said since Booker came down, is that the Court is supposed to look at the individualized sentence, at the person that's before them, not just the crime. And in this particular case, you have Ms. Arnao, and the government in its brief basically says, well, anybody who comes in and steals a million dollars would be subject to this range. She's not anybody who came in and stole a million dollars. In the first case, the Court has seen that Ms. Arnao got very little of the benefit of this million dollars, a small percentage. And second place, she's a person who went to work every day and worked hard at a job that actually performed a lot of good. And Judge Buckwalter says that in the record. Are you conceding that the loss attributable to your client is at least a million dollars? Your Honor, the loss attributable to our client, I'm glad you raised that, because the guideline level that you're discussing with Mr. Buffone, as far as the Mitchell-Rubin and the Senate matters, does not apply to Ms. Arnao. The guideline range that applied to Ms. Arnao I believe was just below a million dollars. I apologize. I think I was parroting the government's brief in which they said a million dollars. It was just below a million dollars. And the only impact that the government's arguments make on her guideline range from a loss calculation factor is a two-level difference. And a two-level difference based upon the variance that the judge gave, which was clearly based on the 3553A factors and not on the guidelines, which Nelson has taught us, the guidelines are not presumptively reasonable. The Supreme Court has stated that. It is clear that the sentence that he imposed was based on a variance and was not based on a departure. It is clear that he imposed it based upon the five factors that he himself stated on the record he imposed them. And the government, he may not be explicit, and the government has alleged that he didn't state these things, but if you look at the record, they're all there. Her history and characteristics, her subservient relationship to her role in the offense. The judge said she was irrationally devoted to Fumo. He talks at length about her life story could be a book. The remorse and acceptance. She wrote a letter accepting responsibility prior to sentencing. That was made part of the record. It was attached to the pre-sentence investigative report. Indeed, she withdrew her appeal in this court as further evidence of that. And the charitable activities that she engaged in, not as part of her job, but on the weekends. Doing things for people that had nothing to do with Citizens Alliance. So his Honor, Judge Buckwalter, a former prosecutor with 20 years of experience on this bench, looked at a five-month-long trial where he saw the defendant's role in that trial, looked at all of these factors, considered them all, and sentenced her to what he thought was appropriate. And under the case law that we have, based upon the Supreme Court precedent, that is appropriate. I'd also like to just briefly address Negroni. I see I'm out of time. This is not Negroni. Judge Buckwalter sent a 55-year-old mother and grandmother who'd worked all her life to jail. She did not get probation. She went to jail. That's a very serious sentence. So her situation is entirely different from the senator's, and it would be entirely appropriate for this Court to deny the government's appeal and affirm the sentence. Thank you, Mr. Egan. Thank you very much. Mr. Salzberg, rebuttal. Thank you very much, sir. Just a few things I want to comment. Let me start with Ms. Arnao because I didn't say much about her. Mr. Egan sets forth a number of reasons that someone might give Ms. Arnao a variance, but the district court, and you'll read the transcript itself, the district court never articulated the sentence in terms of the factors he's listing. The closest he came was in talking about her remarkable story as a teenage mother 30 years earlier. All this about subservience and all that, he never linked it to the sentence, and that's why this is Negroni. Negroni as well, the district court went through factors, but this court explained it never justified the extreme variance based on anything it discussed at the hearing, and we believe it's a replay. You also, of course, have the guideline errors with Ms. Arnao. It's not just two levels, as my friend Mr. Egan said. It's four because sophisticated means, which I'm going to talk about in a minute, applies to her as well that she wasn't given four levels. This court has said over and over in Langford, for example, that a correct guideline calculation is crucial to the sentence, and this court can't really go much further without it. I know Judge Nygaard was on the panel in Langford. I don't just want to pick on that because I think every member of this circuit has been on decisions that have articulated these basic principles. And so her sentence is unreasonable procedurally both because of the guidelines error and because there's really no explanation given of this enormous variance for someone who was a mature person, was made the executive director of a charity, and helped steal over a million dollars, some of which went into her pocket, along with the public officials she worked for who guided her in all of this. Second, with regard to this departure issue, going back to Mr. Buffone, he says, well, the judge made it clear at Arneo's sentencing that what he had done was a departure for Mr. Fumo. No, we have to look at the timing here. Fumo was sentenced on July 14th. The district court repeatedly said it was giving a departure. Arneo was sentenced on July 21st. The district court said, I gave Fumo a departure. Then the district court considered the Rule 35 motion that the defense presented on July 23rd and then issued this confusing set of judgment and commitment order and attachments, leaving everything completely up in the air. What's really remarkable here, and we comment on this in our reply brief, is we have the defense asking for a departure, then going back to the district judge and saying, no, we'd like you to call it a variance, getting the rulings that they received, and then coming to this court and saying, it's a departure. We described it in our brief as gamesmanship, and that's what's happening here. We really don't have a clear view. But if it is a departure, what Mr. Buffone did not address, and I know his time was limited, is is it even permissible as a departure? And the answer to that on the basis of Serafini is clearly no. So we just have error after error, a confluence of errors that are piled on top of each other here. With regard to the explanation of the prior sentence, no, the district court did not sufficiently explain its rulings. Now, I do agree in all fairness. I have to agree with Mr. Buffone a little bit that, sure, a district court can rule on things sometimes by saying, I accept the government's position, I accept the defense position, if it's all clearly articulated on the record. The problem here with the enhancements for sophisticated means, charitable work, is that the court said it was relying on the defense arguments, and there was no defense argument that would justify denial of these things. You just heard as to charitable work, clearly Mr. Fumo sought funds from PICO on behalf of the charity and then pilfered some for himself, and that guideline squarely applied, and the defense has never answered that. Sophisticated means, you just heard the defense view. What Mr. Buffone just said is not supported in the record at all. He said it's all about intent and that Eastern Leasing did lease other vehicles, and cars were put into Eastern Leasing's name, he said, quote, for legitimate business purposes. There is not one iota of evidence in the record supporting those statements. Eastern Leasing took four vehicles in its name, a town and country van that was Mr. Fumo's luxury van at the shore, a navigator, so his drivers would have an additional luxury vehicle to drive them around in Philadelphia, an escalade that replaced, I think the navigator replaced the escalade, and a jeep, which was Ms. Arnao's take from this that she took. That's it. They did it in a concealed way so that nobody could find it. It's very easy now to say, well, it's not sophisticated. All they did was buy something and put it in their name. It was sophisticated because it was completely hidden, along with all the other transactions in this case, and it took an extraordinary investigative effort through tens of thousands of pieces of paper to find these transactions and find what was so carefully hidden from the auditors, from the state, from the IRS, and that wasn't all that sophisticated means. We explain in our brief the numerous other shell entities that were used for the tasker expenditures, for the parking lot, for the political polling. That's the thing in this case. It just goes on and on and on. That's what the district court never addressed. That's what the defense never rebutted. And finally, if I could just take one second and talk about the issue on the juror. We agree with Your Honor's suggestion. I know it's not ruling, but the suggestion that there was never a sufficient basis here. The juror issue is all about this court's decision in Gilson. This court said very clearly in Gilson, and we are highly reluctant to bring back jurors after their service is concluded. It poses all sorts of problems, and we'll only do it when there's a substantial basis and when there's a showing of substantial prejudice, and in this case there was neither. Thank you very much, Your Honor. Very good. Thank you, Mr. Sousmer, Mr. Buffone, and Mr. Egan. Thank you very much. Very difficult case. We will take it under advisement, and we will advise as expeditiously as possible. Thank you. The court is adjourned.